UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| E. & J. GALLO WINERY,<br><br>             Plaintiff,<br><br>   v.<br><br>PERNOD RICARD USA, LLC, an<br>Indiana Limited Liability<br>Company<br><br>         Defendants. | 1:06-CV-00823 OWW-SMS<br><br>MEMORANDUM DECISION AND ORDER<br>DENYING DEFENDANT'S MOTION TO<br>DISMISS |

## 1.   INTRODUCTION

Defendant Pernod Ricard USA ("Pernod") moves to dismiss Plaintiff E. & J. Gallo Winery's ("Gallo") declaratory judgment action, which seeks a declaration that Pernod has no protectable rights under federal and state law to its use of packaging and label design elements (trade dress) for its "cooler" products. (Doc. 7-1, Motion to Dismiss, Filed July 19, 2006.)  Gallo opposes the motion.  (Doc. 18, Opposition, Filed August 15, 2006.)

## 2.   PROCEDURAL HISTORY

         On June 26, 2006 Gallo filed a complaint for declaratory relief.  (Doc. 1, Complaint.)  On July 19, 2006 Pernod filed a motion to dismiss the complaint for lack of justiciability. (Doc. 7-1, Motion to Dismiss.)  On August 15, 2006 Gallo opposed

**1**

1  the motion.  (Doc. 18, Opposition.)  On August 31, 2006 Pernod

2  filed its reply.  (Doc. 19, Reply to Plaintiff's Opposition.)

3  **3.  <u>FACTUAL BACKGROUND</u>**

4  **A.   The Parties**

5       Gallo is a corporation with its principal place of business

6  in California.  (Doc. 1, Complaint ¶ 2, Filed June 25, 2006.)

7  Gallo is in the business of producing and distributing wines and

8  other alcoholic beverages in the United States through wholesale

9  distributors.  (*Id.*)  Gallo produces and distributes a product

10 known in the industry and to consumers as a "cooler" under the

11 brand and trademark "Bartles and Jaymes."  (*Id.* at ¶ 4.)

12      Pernod is a limited liability company organized under the

13 laws of the State of Indiana with its principal place of business

14 in White Plains, New York.  (*Id.* ¶ 3.)  Pernod is also in the

15 business of producing and distributing various alcoholic

16 beverages in the United States and is licensed to do business, is

17 doing business, and maintains an office in California.  (*Id.*)

18 Pernod produces and distributes a cooler product under the brand

19 and trademark "Seagram's." (*Id.* at ¶ 4.)

20      Gallo's complaint alleges that there has been a decline in

21 recent sales of coolers in the market and that its cooler sales

22 have exceeded the rate of decline, while Pernod's cooler sales

23 have been worse.  (*Id.*)

24 **B.   The Demand Letter**

25      By letter to Gallo dated June 20, 2006 ("demand letter"),

26 counsel for Pernod asserted that Gallo was infringing Pernod's

27 alleged rights by Gallo's use of packaging and label design for

28 Gallo's flavored Bartles & Jaymes coolers.  (*Id.* at ¶ 5.)

**2**

Counsel demanded that Gallo "must immediately cease such unlawful misappropriation." (*Id.*)

Pernod's demand letter further charged that Gallo intentionally misappropriated Pernod's good will by remodeling its packaging to include the principal elements of:

  1. a beach theme, including sand and a beach prominently displayed throughout the packaging

  2. depiction of fruit that indicates the flavor of the cooler on the left side of each panel of the packaging with a picture of a sailboat on the right side of the panel as part of the beach theme; and

  3. dominant use of the color blue on the packaging and on the bottle labels.

(*Id.*) Counsel for Pernod alleged that in 2005 Gallo introduced a new package design for Bartles & Jaymes that "effectively adopted an identical design concept and color theme as the redesigned 2004 Pernod packaging." (*Id.*)

Pernod asserts that there are no significant differences between Pernod and Gallo cooler labels and packaging. (*Id.*) The letter states that the Gallo cooler packaging "blurs" with the Pernod packaging; that the use of similar label colors "further exacerbates the situation;" and that consumers are likely to be confused as to believe that Gallo coolers are related to, sponsored by, or associated with the Pernod product. (*Id.*) According to Pernod, "this likelihood of confusion hurts consumers and invades Pernod's rights." (*Id.*) The letter charges that Gallo's packaging and labels constitute trademark and trade dress infringement in violation of the Lanham Act, 15 U.S.C. § 1051, et seq., as well as various state unfair

competition laws.  (*Id.*)  The letter further states that "it cannot tolerate (Gallo's) poaching of Pernod's label and packaging."  (*Id.*)

Pernod's letter includes counsel's statement that she is making an attempt to "resolve this matter amicably."  (*Id.*) However counsel's expressed intent to reach an "amicable resolution" is followed by a demand that Gallo immediately cease manufacturing the blue beach theme labels and begin creating a new packaging that is not likely to lead to confusion.  Gallo was given a thirty day deadline to cease all distribution of the Bartles & Jaymes blue beach theme packaging and eight days to respond to the letter.  (*Id.*)  In the alternative Pernod agreed to allow Gallo to continue the packaging through September 30, 2006 so long as Gallo restores the black rim on its bottles that was present prior to 2005.  (*Id.*)

## C.   The Email Exchange

Gallo sent Pernod an email on June 21, 2006 acknowledging receipt of Pernod's letter.  (Doc. 9-3, Richman Decl., Ex. B.) Gallo informed Pernod that it would require more time to give Pernod a substantive response due to personnel summer travel schedules.  (*Id.*)  Counsel for Gallo also denied that Gallo "poached" the packaging of Pernod.  (*Id.*)  Gallo asked Pernod to provide answers to the following four questions:

> 1.   To provide a factual basis for Pernod's claim of "likely confusion," including any instances of confusion;

> 2.   To provide a factual claim for Pernod's claim of "trademark infringement;"

> 3.   To give an exemplar of the specific trade dress that Pernod believes is

**4**

being infringed and an exemplar of the specific trade dress that Pernod believes is infringing it; and

4.   Whether Pernod is claiming that the problem arises from the "blue color" on the label, the "beach scene" on the label, or the combination of both?

(*Id.*)

In response to these inquiries Pernod's counsel sent a second communication on June 22, 2006 which referred Gallo back to the initial demand letter and stated: "It would be a mistake to focus attention on any single aspect of the packing and labeling since it is the overall impression that creates confusion." (*Id.*)  Pernod's counsel also refused to give Gallo an extension of time to provide a substantive response to Pernod's demand letter.  (*Id.*)

Gallo then inquired as to whether Pernod's response to Gallo's inquiries was a refusal to answer Gallo's questions. (*Id.*)  Pernod's counsel stated that its responses were the replies to Gallo's questions and that Pernod's investigation was ongoing regarding instances of actual confusion.  (*Id.*)

Gallo filed its complaint for declaratory relief on June 26, 2006.  (Doc. 1, Complaint.)

**D.   Post Filing Conduct**

On July 31, 2006 Gallo sent a letter to Pernod's counsel inquiring whether Pernod intended to sue Gallo based on the matters stated in the demand letter. (Doc. 18-2, Decl. of Kip Edwards "Edwards Decl.", Filed August 8, 2006.)  Gallo offered to dismiss its action if Pernod agreed in writing not to bring an infringement action against Gallo. (*Id.*)  Pernod refused this agreement and accused Gallo of attempting to manufacture "after

**5**

the fact 'evidence'" that would give an indication of Pernod's
intent to file an infringement action. (*Id.*, Ex. B.)  Lastly,
Pernod agreed to confirm no intention to bring suit if Gallo
reintroduced the black neck band on its bottle packaging that
characterized the Gallo trade dress prior to 2005.  (*Id.*)

Gallo also alleges that it emailed a copy of the complaint
to Pernod the day after it was filed.  (Doc. 19, Opposition,
Filed August 31, 2006.)  Gallo argues that counsel for Pernod did
not call or have any communication with it after receipt of the
complaint.  (*Id.*)  Gallo also asserts that Pernod contacted a
lawyer, who previously represented Gallo and who knew counsel for
Pernod, to inquire whether litigation would be filed by Gallo.
(*Id.*)  Counsel for Pernod was unwavering in her position that
Gallo had to change the packaging.  (*Id.*)

The primary issue in this case is whether Pernod's demand
letter and subsequent email created a sufficient threat of
litigation against Gallo to create an actual controversy
cognizable as required by the declaratory judgment act.

**E.   Pernod's Litigation Reputation**

Paul Reidl ("Reidl"), a business executive, has handled
trademark enforcement and litigation matters for Gallo for
fifteen years.  (*Id.*, ¶ 2.)  Pernod is one of the largest alcohol
beverage companies in the world.  (Doc. 18-4, Decl. of Paul W.
Reidl "Reidl Dec.," Filed August 15, 2006, ¶ 16.)  Reidl opines
that Pernod has a reputation in the industry for being aggressive
in litigation.  (*Id.*)  For example, Pernod has engaged in a
multi-year battle against a competing beverage company, Bacardi,
over the rights to the "Havana Club" trademark.  (*Id.*)

**6**

1    Reidl found Gallo's letter to have an "unusually aggressive"

2    tone.  (*Id.,* ¶ 7.)   Based on Reidl's experience, he believes the

3    author of a demand letter who is genuinely interested in

4    resolving a trade dispute and who is asked to clarify the factual

5    basis for the claim will work with the opposing party and exhibit

6    flexibility in enforcing demands.  (*See, Id.*, ¶ 10.)   Reidl

7    expected to see a business executive or in-house attorney

8    handling preliminary negotiations, not litigation counsel.   Reidl

9    based his belief that Pernod would sue Gallo on Pernod's refusal

10   to extend the time of its imposed deadlines; its failure to

11   provide evidence of the alleged consumer confusion; its failure

12   to explain the basis for its case, and its requirement that Gallo

13   cease the use of its current packaging and change the packaging

14   within 38 days.  (*Id.*)

15   The circumstances of this case are very similar to those

16   Reidl describes that arose in litigation between Gallo over its

17   "Turning Leaf" label and Kendall Jackson Winery.  (*Id.*, ¶ 11.)

18   In that case Gallo also faced a plaintiff with a reputation for

19   being litigious.  (*Id.*)   Kendall Jackson brought suit for

20   competitive purposes, retained experienced litigation counsel,

21   who intentionally kept the trademark and trade dress claims vague

22   for tactical reasons, and whose only "settlement position" was

23   that Gallo capitulate to its demands.  (*Id.*)   The case, which was

24   filed in New York, resulted in several years of bitter and

25   expansive litigation.  (*Id.*)   Based on this experience, Gallo

26   determined that it did not want to litigate Pernod's case in New

27   York, "the most expensive venue in the nation due to high billing

28   rates."  (*Id.*)   In fifteen years of handling Gallo's trademark

**7**

1  litigation matters, this is the only declaratory judgment

2  complaint Reidl directed be filed. (*Id.*, ¶ 13.)

3  ### 4. __STANDARD OF REVIEW__

4  A motion to dismiss under Fed. R. Civ. P. 12(b)(1) addresses

5  the court's subject matter jurisdiction, derived from the case or

6  controversy clause of Article III of the U.S. Constitution.

7  *Gingo v. United States Dep't of Educ.,* 149 F. Supp. 2d 1195, 1200

8  (E.D. Cal. 2000). Federal courts are limited in jurisdiction; it

9  is presumed that a case lies outside the jurisdiction of the

10 federal courts and the burden of establishing the contrary rests

11 upon the party asserting jurisdiction. *Kokkonen v. Guardian Life*

12 *Ins. Co. of Am.,* 511 U.S. 375, 377 (1994); *see also, Vacek v.*

13 *United States Postal Serv.,* 447 F.3d 1248, 1250 (9th Cir. 2006).

14 A Rule 12(b)(1) jurisdictional attack may be facial or

15 factual. *Safe Air v. Meyer,* 373 F.3d 1035, 1039 (9th Cir. 2004).

16 In a facial attack, the challenger asserts that the allegations

17 contained in a complaint are insufficient on their face to invoke

18 federal jurisdiction. *Id.* By contrast, in a factual attack, the

19 challenger disputes the truth of the allegations that, by

20 themselves, would otherwise invoke federal jurisdiction. *Id.* A

21 jurisdictional challenge is a factual attack which relies on

22 extrinsic evidence and does not assert lack of subject matter

23 jurisdiction solely on the basis of the pleadings. *Id.*

24 Unlike a Fed. R. Civ. P. 12(b)(6) motion, for motions under

25 Fed. R. Civ. P. 12(b)(1), the moving party may submit affidavits

26 or any other evidence properly before the court. *Association of*

27 *Am. Med. Colleges v. United States,* 217 F.3d 770, 778 (9th Cir.

28 2000). It then becomes necessary for the party opposing the

**8**

motion to present affidavits or any other evidence to satisfy its burden of establishing that the court, in fact, possesses subject matter jurisdiction. *Id.* The district court does not abuse its discretion by looking to this extra-pleading material in deciding the issue, even if it becomes necessary to resolve factual disputes. *Id.*

In a factual 12(b)(1) motion, no presumptive truthfulness attaches to plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims. *Ritza v. International Longshoremen's & Warehousemen's Union,* 837 F.2d 365, 369 (1988); *see also Gingo,* 149 F. Supp. at 1200 (quoting *Mortensen v. First Fed. Sav. & Loan Assoc.,* 549 F.2d 884, 891 (3rd Cir. 1977).) Moreover, the plaintiff has the burden of proof that jurisdiction does in fact exist. *Gingo,* 149 F. Supp. at 1200. Although deference is given to a plaintiff's factual allegations in a 12(b)(6) motion, plaintiff's allegations need not be taken as true when considering a rule 12(b)(1) motion. *Id.*

## 5. **DISCUSSION**

**A.  The Declaratory Judgment Act and Subject Matter Jurisdiction Requirement.**

The Declaratory Judgment Act provides that "in a case of actual controversy within its jurisdiction... any court of the United States... may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. §2201(a). Any such declaration shall have the force and effect of a final

**9**

1    judgment or decree and shall be reviewable as such.  *Id.*

2        Before declaratory relief can be granted, federal subject

3    matter jurisdiction requirements must be satisfied.  *Gov't.*

4    *Employees Ins. Co. v. Dizol,* 133 F.3d 1220, 1222-1223 (9th Cir.

5    1998) (*citing Skelly Oil Co. v Phillips Petroleum Co.*, 339 U.S.

6    667, 671 (1950).)  The court's jurisdiction in this case is based

7    on diversity of citizenship and federal question jurisdiction

8    under the Lanham Act, 15 U.S.C. §§ 151, et seq.  Original

9    diversity jurisdiction exists when the parties are of diverse

10   citizenship and the amount in controversy exceeds $75,000,

11   exclusive of interests and costs.  28 U.S.C. § 1332(a).  Where

12   diversity jurisdiction exists, the district court has discretion

13   to hear a declaratory judgment action.  *Avemco Ins. Co. v.*

14   *Davenport,* 140 F3d 839, 842 n. 1 (9th Cir. 1998).

15       Gallo is a corporation with its principal place of business

16   in California.  (Doc. 1, Complaint ¶ 2.)  Pernod is a limited

17   liability company organized under the laws of the State of

18   Indiana with its principal place of business in White Plains, New

19   York.  (*Id.* ¶ 3.)  Pernod is the only defendant named in this

20   action.  The amount in controversy exceeds the sum or value of

21   $75,000 exclusive of interests and costs.  (Doc. 1, Complaint ¶

22   1.)

23           **i.   Actual Case or Controversy Requirement Under the**
             **Declaratory Judgment Act**

24

25       In determining whether declaratory relief can be granted, an

26   inquiry must be made as to whether there is a case of actual

27   controversy between the parties.  *Principal Life Ins. Co. v.*

28   *Robinson,* 394 F.3d 665, 669 (9th Cir. 2005); *American States Ins.*

**10**

*Co. v. Kearns,* 15 F.3d 142, 144 (9th Cir. 1994).  This
requirement is identical to the Article III's constitutional case
or controversy requirement.  *Kearns,* 15 F.3d at 144.  In order
for a case to be justiciable under Article III of the
Constitution, it must be ripe for review.  *Id.*  A controversy in
this sense must be definite and concrete, touching the legal
relations of the parties having adverse legal interests.  *West v.
Secretary of the DOT*, 206 F.3d 920, 924 (9th Cir. 2000).  It must
be a real and substantial controversy, admitting of a specific
relief through a decree of conclusive character, as distinguished
from an opinion advising what the law would be upon a
hypothetical state of facts.  *Id.*  The party invoking federal
jurisdiction bears the burden of establishing the existence of an
actual case or controversy.  *See, Dizol*, 133 F.3d at 1228.  The
Ninth Circuit has held that something less than an "actual
threat" of litigation is required to meet the "case or
controversy" requirement; instead, courts must focus on whether a
declaratory plaintiff has a "reasonable apprehension" that he or
she will be subjected to liability.  *Paramount Pictures Corp. v.
Replay TV,* 298 F. Supp. 2d 921, 924 (C.D. Cal. 2004)(citing
*Societe de Conditionnement en Aluminum v. Hunter Engineering Co.,
Inc.,* 655 F.2d 938, 944 (9th Cir. 1981).)

### ii. Actual Case or Controversy in Patent and Trademark Cases

The United States Court of Appeals for the Federal Circuit,
which has appellate jurisdiction over all patent and trademark
cases applies a two part test for determining the justiciability
of a declaratory judgment claim concerning patent and trademark

**11**

1  actions. *See, Fresenius USA, Inc. v. Transonic Systems, Inc.*,
2  207 F. Supp. 2d 1009, 1011 (N.D. Cal. 2001).  There must be both
3  (1) an explicit threat or other action by the patentee which
4  creates a reasonable apprehension on behalf of the declaratory
5  plaintiff that it will face an infringement suit, and (2) present
6  activity which could constitute infringement or concrete steps
7  taken with the intent to conduct the infringing activity. *See,*
8  *Id.; see also, O'Hagins, Inc. v. M5 Steel Mfg., Inc.,* 276 F.
9  Supp. 2d 1023, 1025 (N.D. Cal. 2003).  The apprehension must have
10 been caused by the defendant's actions.  *Hal Roach Studios, Inc.*
11 *v. Richard Feiner and Co., Inc.*, 896 F.2d 1542, 1556 (9th Cir.
12 1989).  If the plaintiff is engaged in the ongoing production of
13 the allegedly patented item, the showing of apprehension "need
14 not be substantial." *Id.* (*citing, Societe de Conditionnement*, v.
15 *Hunter Engineering*, 655 F.2d 938, 944 (9th Cir. 1981).)  These
16 principles must be applied with a flexibility "that is oriented
17 to the reasonable perceptions of the plaintiff. *Id.*  Here,
18 Pernod claims a protectable trademark in Seagram's coolers that
19 is infringed by Gallo's Bartles & James island coolers, which are
20 alleged to be marketed in deceptive and confusing packaging.
21 Plaintiff Gallo is actively competing in the cooler market by
22 current sales of its allegedly infringing coolers.  The suit
23 results from Pernod's demands to Gallo to cease marketing coolers
24 in allegedly infringing packaging and trade dress.

25     In *Hal Roach Studios*, the Ninth Circuit held that there was
26 a case or controversy present between the parties suitable for
27 declaratory relief. *Hal Roach Studios*, 896 F.2d at 1556.
28 Plaintiffs had entered into a written agreement with Defendants

**12**

to licence the television rights to certain Laurel and Hardy
silent films for a ten year period with an option to renew the
license for a second ten year term. *Id.* at 1544.  As the ten
year period was coming to an end, Plaintiff filed a complaint
against Defendant seeking a declaration that the licensing
agreement would expire and that Plaintiff had valid copyrights to
the films. *Id.* at 1545.  The Defendant answered and filed a
counterclaim seeking a declaration that *Hal Roach Studios* did not
own valid copyrights to the silent films or to numerous other
silent films in the Hal Roach library. *Id.*  In addressing the
district court's dismissal of defendant's declaratory relief
counterclaim, the Ninth Circuit found a justiciable controversy
between the parties. *Id.*  The court identified that Defendant
was currently engaged in and had alleged that they would continue
to engage in the use and exploitation of the films. *Id.* at 1556.
There, Plaintiffs had sent a letter to Defendants two years prior
to the expiration of the agreement[1] stating that, after the
agreement expired, Defendants would have no rights of any kind
whatsoever in the films. *Id.*  The letter also questioned that
certain rumors that Defendants' intended to continue to
distribute the films after the expiration date. *Id.*  The court
noted that this statement could reasonably be viewed as a threat
to Defendants.  It was also relevant that Hal Roach Studios had
not stated that it would not institute an infringement action.
*Id.*  The totality of these circumstances were sufficient to

[1] The agreement was to expire in September of 1986.
Plaintiffs letter was sent in March of 1984. *Hal Roach Studios,*
896 F.2d at 1556.

**13**

establish a real case or controversy existed to support a declaratory relief action.

The Ninth Circuit also found a case and controversy between the parties in *Chesebrough Pond's, Inc. v. Faberge*, 666 F.2d 393, 397 (9th Cir. 1982). Plaintiff and Defendant were competitors in the market for men's toiletries and cosmetics. *Id.* at 395. Plaintiff applied to register its trademark "Match." *Id.* Defendant had acquired the "Macho" trademark from a prior owner. *Id.* Defendant received a notice of the pending registration of "Match" and sent Plaintiff a letter stating that it believed the two marks to be "confusingly similar," and that unless Plaintiff withdrew its application, Defendant would file an opposition. *Id.* Plaintiff refused and Defendant filed an opposition with the Patent and Trademark Office. *Id.* Defendant alleged that "Match" so resembled "Macho" as to be likely to cause confusion, mistake, and deception. *Id.* Plaintiff filed an answer and a petition to cancel Plaintiff's "Macho" mark. *Id.* The administrative action continued for three years but remained in the discovery stage when Plaintiff filed a declaratory judgment action. *Id.* The *Chesebrough* court found a real case or controversy to exist between the parties for the following reasons:

> 1. The letter sent from Defendant to Plaintiff stated a prima facie case for trademark infringement as outlined in 15 U.S.C. § 1114(1) because it alleged Defendant's ownership of a registered trademark and Plaintiff's use in commerce of a mark so similar to Plaintiff's that it was likely to cause confusion. *Id.* at 396. The court reasoned that the likelihood of confusion standard is relevant to both registration and infringement proceedings. *Id.*

**14**

2.   It was reasonable to infer from
     Defendant's letter a threat of an
     infringement action.  *Id.* at 396-397.

3.   Defendant did not act to dispel such
     infringement action.  *Id.* at 397.

4.   Instead of disclaiming an intent to
     pursue an infringement action, Defendant
     responded to the complaint with a
     counterclaim seeking damages for
     infringement.  *Id.*  The actual filing of
     a counterclaim for infringement bolsters
     Plaintiff's claim that a real threat
     existed.  *Id.*

5.   The inference drawn from Plaintiff's
     actions was reasonable in view of the
     business relationship of the parties.
     *Id.*  Plaintiff and Defendant are both
     involved in an expanding and highly
     competitive market.  *Id.*  Plaintiffs
     were faced with the choice of continuing
     to forgo competition in the market
     pending resolution of the Patent and
     Trademark action or entering the market
     and risking substantial future damages
     and harm to the relationship with its
     customers and retailers.  *Id.*

Pernod's first argument for dismissal is that the court
lacks subject matter jurisdiction because there was no actual
case or controversy between Gallo and Pernod when Gallo initiated
this declaratory judgment action.  Pernod argues that upon
receipt of its demand letter Gallo should have first attempted to
resolve the matter out of court.[2]  Pernod does not claim that

---

[2] In support of its argument, Pernod primarily relies on
*Dunn Computer Corp. v. Loudcloud Inc.*, 133 F. Supp. 2d 823 (E.D.
VA 2001) as well as a series of unpublished cases.  However, in
this circuit *Societe de Conditionnement* and its progeny are
binding authority.  *Chesebrough Pond's, Inc. v. Faberge*, 666 F.2d
393, 396 (9th Cir. 1982).  *Dunn* is distinguishable since the
Plaintiff in that case filed a three count complaint eight days
after receiving the letter without so much as responding to the
letter or contacting Defendant.  *Id.* at 826.

Gallo or any other party threatened with trade dress infringement by a competitor has a duty to seek alternative dispute resolution ("ADR") before seeking judicial relief.[3]  Pernod asserts that Gallo has no reasonable basis to support a fear of imminent litigation arising from Pernod's letter or its conduct following the initial demand.

Pernod relies on *Shoom Inc. v. Electronic Imaging Sys. of Am., Inc.,* 2006 U.S. Dist. LEXIS 39594, 9-10 (N.D. Cal. 2006). The *Shoom* court dismissed a declaratory judgment action because the defendants' letter and subsequent emails did not threaten litigation and therefore did not create a reasonable apprehension of litigation. *Id.* at 91-10.  *Shoom* is distinguishable.  The letter in *Shoom* was sent to hundreds of newspapers and newspaper organizations and it consisted of nothing more than an offer to license a patent.  *Id.* at 14.  It specifically stated that "EISA intended to soon license its rights or interests in the patent in question."  *Id.*  The court found the language of the letter not threatening and containing "very vague" language that only mentioned that the patent "may concern existing or contemplated system decisions that may relate to the [systems] in question." *Id.* at 14-15.  The letter was signed by the company president rather than legal counsel and did not threaten litigation or insinuate actual infringement by Shoom or its customers.  *Id.* at 15.

*//*

---

[3] Statement of Pernod counsel at oral argument heard on September 11, 2006.

### iii. Analysis

As in *Hal Roach*, Gallo currently uses similar characteristics in its "cooler" packaging to those used by Pernod.  Gallo directly competes with Pernod in the cooler market.  Specifically as of 2005 Gallo allegedly incorporated the following characteristics in its "cooler" packaging:

> 1. a beach theme, including sand and a beach prominently displayed throughout the packaging.
>
> 2. the depiction of fruit that indicates the flavor of the cooler on the left side of each panel of the packaging with a picture of a sailboat on the right side of the panel a part of the beach theme and
>
> 3. dominant use of the color blue on the packaging and on the bottle labels.

Pernod's outside patent litigation counsel sent Gallo a demand letter on June 20, 2006 stating that Gallo's new packaging system effectively adopted an identical design concept and color theme as the Pernod packaging.  Further, Pernod accused Gallo of "invading Pernod's rights" and of creating confusion among the two "cooler" brands.  In contrast to *Shoom*, Pernod's letter includes specific accusations that Gallo's packaging constituted trademark and trade dress infringement in violation of the United States Trademark Act, 15 U.S.C. § 1051 as well as "various unfair competition laws."[4]

---

[4] Trademark owners have a monopoly over their marks, which they can license as they see fit as long as such licensing does not cause public confusion.  *Idaho Potato Comm'n v. G&T Terminal Packaging, Inc.,* 425 F.3d 708, 715 (9th Cir. 2005).  The test of trademark infringement under state, federal, and common law is whether there will be a likelihood of confusion.  *M2 Software,*

1    Pernod's letter threatened that it would "not tolerate the
2    poaching of (its) label and packaging."  As a result, Gallo was
3    given eight days to provide a substantive response to the letter
4    and thirty days to discontinue use of the packaging.  In the
5    alternative, Pernod would permit Gallo to use the packaging
6    through September 30, 2006 so long as Gallo changed its packaging
7    and reincorporated the black rim on its bottles that was present
8    prior to 2005 (capitulation to the charged infringement claim).

9    The letter was written in aggressive and traducing language,
10   setting forth a strict 30 day deadline for Gallo to cease the use
11   of its beach theme and existing packaging.  While Pernod's
12   counsel  used the term "amicable resolution," this was contingent
13   upon Gallo acquiescing in Pernod's demands, which required Gallo
14   discontinuing use of existing packaging and inferentially
15   removing the allegedly infringing packaging from the marketplace
16   within the 30 day demand period.  Although the letter did not
17   expressly say: "comply or be sued," the statement that Pernod
18   would not "tolerate" continued use and Pernod's express reference
19   to Gallo's alleged violations of the Lanham Act, coupled with the
20   aggressive deadlines imposed on Gallo to comply, provide ample

21

22

23   *Inc. v. Madacy Entm't,* 421 F.3d 1073, 1080 (9th Cir. 2005).  To
24   determine whether there is a likelihood of confusion between the
     parties allegedly related goods and services, the Ninth Circuit
25   considers the following eight factors: 1. strength of the mark;
     2. proximity of the goods; 3. similarity of the marks; 4.
26   evidence of actual confusion; 5. marketing channels used; 6. type
     of goods and degree of care likely to be exercised by the
27   purchaser; 7. defendant's intent in selecting the mark; and 8.
     the likelihood of expansion of the product lines.  *Id.*
28

**18**

1  basis for an objectively reasonable belief that litigation would
2  follow if Gallo did not comply.

3       As in *Chesebrough*, Gallo and Pernod are competitors in the
4  same market for "coolers."  Pernod's letter accused Gallo of
5  infringing Pernod's trademark by creating confusion among
6  "cooler" consumers.  Pernod's lack of response to Gallo's
7  subsequent emails is inconsistent with an attempt to amicably
8  resolve the dispute.  Pernod made no attempt to dispel any of
9  Gallo's fears that Gallo faced an intractable demands and
10 imminent infringement action if it did not meet the deadlines
11 Pernod imposed.  When counsel for Gallo requested further
12 information, Pernod's counsel simply referred him back to
13 Pernod's original letter and stated that Pernod's investigation
14 as to specific instances of consumer confusion was ongoing.  When
15 Gallo's counsel requested additional time to provide a
16 substantive response, Pernod refused to modify its deadline.
17 Under the principles of *Societe de Conditionnement*, the initial
18 Pernod letter, the subsequent email exchange between the parties,
19 and Pernod's unyielding conduct, which did not invite or suggest
20 a standstill while the status quo was maintained, gave Gallo a
21 reasonable apprehension that an infringement action by Pernod was
22 imminent.

23      Gallo knew that Pernod has chosen eminent New York patent
24 and trademark counsel, who enjoyed the reputation of being
25 vigorous litigators in trial courts, state and federal.  Pernod
26 did not open contact with Gallo through a business executive or
27 in-house counsel.  Rather, Pernod's initial contact was through
28 outside trial counsel.  Gallo also justifiably believed that

**19**

Pernod, had in the past vigorously and aggressively litigated
intellectual property cases against its clients competitors in
the courts.  From this, Gallo believed that Pernod had geared up
for a lawsuit. Gallo also argues that Pernod's post litigation
behavior bolsters Gallo's belief that a real threat of litigation
existed.  Pernod did not respond in any way to Gallo's request
for an assurance that Pernod would not immediately bring an
action.  This is further evidence of the reasonableness of
Gallo's belief.

Gallo and Pernod are direct competitors in a highly
competitive beverage market.  Pernod gave Gallo a strict 30 day
deadline to change its packaging and an extension until September
to bring back the distinctive black rim on Gallo's "cooler"
bottles if Gallo needed more time to change the packaging.  Gallo
alleges that it and Pernod are leaders in the "cooler" market,
but that Pernod has suffered a greater reduction in sales in a
softening market.  Pernod gave Gallo no alternative if Gallo
failed to meet Pernod's deadlines.  Given the language of the
letter, the only reasonable conclusion Gallo could draw was that,
absent its compliance with Pernod's demands, Pernod would file a
lawsuit.  Gallo faced the risk of substantial future damages,
legal expenses, and potential harm to the relationship with its
customers and retailers if it failed to comply with Pernod's
deadlines and did not change its cooler packaging.  The dispute
over Pernod's packaging claims creates an actual case or
controversy between Pernod and Gallo over Gallo's cooler
beverages' packaging and trade dress.

1    In distinguishing *Chesebrough*, Pernod argues: (1) Defendants

2    in *Chesebrough* outlined a prima facie case for trademark

3    infringement in its letter, (2) Defendants in *Chesebrough* filed

4    an opposition with the trademark office against Plaintiff's

5    registering the "Macho" mark, and (3) Plaintiffs filed a

6    counterclaim against Defendants.  Pernod maintains that the

7    *Chesebrough* facts "pale in comparison," but does not specifically

8    distinguish the *Chesebrough* facts from the facts of this case.

9    The *Chesebrough* court expressly rejected an argument that a

10   pending administrative action influenced the "case or

11   controversy" inquiry.  *Chesebrough,* 666 F.2d at 396 (rejecting

12   *Merrick v. Sharp & Dohme, Inc.,* 185 F.2d 713 (7th Cir. 1950) held

13   that the filing of notice of opposition with the Patent and

14   Trademark Office is not equivalent to a charge of infringement.

15   A simple opposition proceeding in the Patent and Trademark Office

16   generally will not raise a real and reasonable apprehension of

17   suit.  *Id.*  Under *Societe de Conditionnement* and its progeny, the

18   focus is on the position and perceptions of the Plaintiff.  *Id.*

19   The Ninth Circuit declined to identify specific acts or

20   intentions of the defendant that would automatically constitute a

21   threat of litigation.  *Id.*  Instead, Pernod's acts are examined

22   in view of their likely impact on competition and the risks

23   imposed upon Gallo to determine if the threat of suit Gallo

24   perceived was real and reasonable.  *Id.*  This requires a flexible

25   approach, oriented in the reasonable perceptions of the

26   plaintiff.  *Id.*

27   Gallo also referred to its prior experience in being sued

28   for copyright trademark infringement in New York.  Pernod's

**21**

1  aggressive letter and course of conduct provided Gallo an

2  objectively reasonable apprehension that a lawsuit was imminent.

3  Rather than having a company executive send a letter to Gallo

4  outlining its concerns, Pernod had outside litigation counsel

5  draft and send the demand letter.  The attorney was not part of

6  Pernod's in house legal staff, but rather an attorney at a well

7  known intellectual property law firm.  The letter itself was

8  written in unequivocal terms, explicitly stating the laws Pernod

9  accused Gallo of violating, and imposing strict deadlines for

10 Gallo to comply with the demands.  Gallo's representative, Reidl,

11 who has at least fifteen years of trademark litigation experience

12 with the company, concluded that Gallo would be sued based on the

13 aggressive language of the letter, the lack of response by

14 Pernod's counsel to Reidl's email, the lack of flexibility

15 regarding the imposed deadlines, and Pernod's litigious

16 reputation.  Gallo's fear of facing litigation in New York in a

17 more expensive venue in the backyard of an aggressive and

18 litigious opponent was reasonably justified given the conduct of

19 the parties.

20     Pernod's motion to dismiss for lack of subject matter

21 jurisdiction is **DENIED.**

22 **C.   Factors Weigh Against Dismissal of This Action**

23     If a suit passes constitutional and statutory muster, the

24 district court must be satisfied that entertaining the action is

25 appropriate.  *Dizol,* 133 F.3d at 1223.  This determination is

26 discretionary, for the Declaratory Judgment Act is deliberately

27 cast in terms of permissive rather than mandatory authority.  *Id.*

28 However, this discretion is not unfettered.  *Id.*  Prudential

**22**

guidance for retention of authority over a declaratory relief
action is provided by *Brillhart v. Excess Insurance Co. of
America,* 316 U.S. 491 (1942)*.*  In deciding whether to abstain in
a federal declaratory relief action, the following factors are
considered:

> 1.   Avoiding needless determination of state
>      law issues
>
> 2.   Discourage litigants from filing
>      declaratory actions as a means of forum
>      shopping
>
> 3.   Avoid duplicative litigation
>
> 4.   Whether there are parallel state
>      proceedings
>
> 5.   Whether the declaratory action will
>      settle all aspects of the controversy
>
> 6.   Whether the declaratory action will
>      serve a useful purpose in clarifying the
>      legal action at issue
>
> 7.   Whether the declaratory judgment action
>      is being sought merely for the purposes
>      of procedural fencing or to obtain a
>      "res judicata" advantage
>
> 8.   Whether the use of a declaratory action
>      will result in entanglement between the
>      federal and state court systems
>
> 9.   The convenience of the parties
>
> 10.  The availability and relative
>      convenience of other remedies
>
> 11.  Whether there are other claims joined
>      with an action for declaratory relief
>      (i.e. bad faith, breach of contract,
>      breach of fiduciary duty, rescission, or
>      claims for other monetary relief)

*Dizol,* 133 F.3d at 1225 n.5 (*citing Kearns*, 15 F.3d at 145;
discussing *Brillhart v. Excess Ins. Co.,* 316 U.S. 491, 495

**23**

1  (1942)); *United Nat'l Ins. Co. v. R&D Latex Corp.,* 242 F.3d 1102,

2  1112 (9th Cir. 2001).  In exercising jurisdiction, the district

3  court is required to articulate its rationale justifying its

4  exercise of jurisdiction.  *R&D Latex Corp.,* 242 F.3d at 1107;

5  *Dizol,* 133 F.3d at 1223.

6       Pernod's second argument in favor of dismissal is that even

7  if there is a sufficient case or controversy between the parties,

8  in the interest of efficiency, the court should dismiss the

9  declaratory judgment action and require Gallo to resolve the

10  matter outside of court.  This unique contention is made without

11  regard to the *Brillhardt* factors.  Beyond its opinion, Pernod

12  offers no support in law or fact to show how this declaratory

13  action will fail to resolve this active controversy and decide

14  the rights and liabilities of the parties.  Litigation will serve

15  the useful purpose of clarifying and resolving the dispute

16  between Pernod and Gallo, instead of leaving the parties to risk

17  and uncertainty in the continued conduct of their businesses.

18  Brillhart abstention is insufficient based on the totality of the

19  circumstances.

## 6.  <u>CONCLUSION</u>

21       Pernod's Motion to Dismiss for lack of subject matter

22  jurisdiction is **DENIED.**

24  **SO ORDERED.**

25  Dated: 10/5/06

26                                    /s/ Oliver W. Wanger

27                               **OLIVER W. WANGER**

28                            **United States District Judge**

**24**